(43 App. Div. 541.)

## PEOPLE v. MERSHON.

(Supreme Court, Appellate Division, Second Department. October 3, 1899.)

FORGERY—IMPROPER ISSUE OF CHECK BY PRESIDENT OF CORPORATION—BY-LAWS —AGREEMENT WITH STOCKHOLDER.

Accused was president of the H. Paint Company, and an officer of the A. Graphite Company. The by-laws of the paint company authorized the president to sign checks, drafts, etc., to have general management, and perform all duties incident to his office; but there was a subsequent verbal agreement that a fund which had been deposited by a stockholder in payment of his stock should not be drawn against, except by consent of the stockholder. The graphite company having sold graphite to the paint company, which the latter failed to pay for as agreed, because it was not merchantable, though the shipment was not rejected, accused took a blank check signed by the treasurer, and countersigned by the stockholder, filled in the amount of the debt, signed the check, and delivered it to another officer of the graphite company, who cashed it. *Held* that, as the stockholder was not a director, and could not enter into any agree-

ment with the directors after he parted with his money, as to its disposition, in contravention of the by-laws, accused was not guilty of forgery in the second degree in issuing the check in violation of the parol agreement.

Appeal from Orange county court.

Stephen L. Mershon was convicted of forgery in the second degree, and from the judgment and an order denying a new trial he appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Hector M. Hitchings, for appellant.

A. H. F. Seeger, for the People.

WOODWARD, J.  The Hudson River Paint Company, a duly-organized corporation of the state of New York, made an assignment for the benefit of its creditors some time prior to the 5th day of February, 1898.  George F. Tillinghast and Robert C. Whitehill were the principal stockholders in the corporation, and were engaged in an effort to reorganize the company for the purpose of carrying on the manufacture of paint.  They had a mill which was equipped with machinery for grinding graphite or plumbago.  While affairs were in this condition, one William J. Robinson visited the city of Newburgh, and met Tillinghast and Whitehill, in company with Rev. Dr. Savage, a Presbyterian who had been engaged in the ministry in that place for a period of 20 years or more.  Robinson represented himself to be interested in a graphite mine in the state of Rhode Island, and an arrangement was entered into by which Robinson sent for the defendant, Mr. Mershon, who was represented to be an officer of the American Ceylon Graphite Company, the owner of the mine. A meeting of these parties was held in a local hotel, at which the affairs of the paint company were canvassed in connection with a proposed arrangement by which the paint company was to purchase supplies of graphite from the American Ceylon Graphite Company. There appears to have been considerable negotiation between the several parties, resulting in a written agreement, bearing date February 5, 1898, in which the party of the first part, the American Ceylon Graphite Company, agrees to sell to the Hudson River Paint Company 150 tons of graphite ore, at $40 per ton, free on board at the mines of the party of the first part; the paint company to have the option of paying cash, less 2 per cent., in 10 days from the date of the bill of lading showing the shipment of the same, or settlement by notes for the full amount of each invoice, said notes not exceeding four months from the date of invoices, and bearing interest at the rate of 5 per cent.  The notes, if this option was accepted, were to be mailed to the party of the first part within the period of 10 days from shipment of the goods.  The parties of the second part, Messrs. Tillinghast and Whitehill, undertake to answer for the paint company, and agree that they will forthwith enter into negotiations with creditors of the paint company to compromise outstanding obligations with notes of the company at four months at full face value, and that they will secure the discharge of the assignee in the manner

provided by law. It is also agreed that the parties of the second part, on coming into possession of the property from the assignee, will deposit the stock of the company with Rev. Dr. Savage, party of the third part, in trust for the purposes of the agreement, together with all securities. Thereafter an application was to be made for an increase of the capital stock to the amount of $40,000, the party of the third part agreeing to subscribe for $10,000 of such stock at par, depositing his check in one of the local banks, to be drawn against by himself in furtherance of the agreement. There are other incidental conditions of the contract for the use of the money, but none which are essential to the determination of the appeal now before us. It is agreed that the party of the first part will furnish graphite at a fixed price for a period of five years, and that the paint company shall purchase all of its graphite of the party of the first part for that period. There is also a provision by which the party of the first part is to come into the immediate possession of $15,000 of the stock of the paint company, the same to be paid for by reserving a certain portion of the amount due on the various consignments of graphite. It is also agreed that, upon the reorganization of the paint company, the party of the third part is to deliver all securities held in trust for the benefit of the treasury of the paint company, and then follows a provision granting an option to secure the party of the third part a certain fixed income upon the amount of his investment, but this does not seem to have been taken advantage of in any particular. It is also stipulated that it is "mutually agreed that the party of the first part shall only be required and obligated to extend the terms of credit to the said Hudson River Paint Company as provided herein, and during the period specified, if the financial condition of the said company remains unimpaired, and its management remains unchanged, after the first meeting of stockholders and directors of said Hudson River Paint Company, which shall be held subsequent to the increase in the capital stock of said company, as hereinbefore provided." Subsequent to the execution of this agreement, the claims of creditors were duly compromised under the terms of the contract, the company was reorganized, the capital stock increased, and the provisions of the agreement, in so far as the reorganization is concerned, were fully carried out, the defendant being elected president of the company. By-laws were adopted, as appears by the admissions of the prosecution in opening the case to the jury, in which it was provided that "the president may draw and sign checks, drafts, notes, and orders for the payment of money, and pay out the same, and may indorse, either for deposit or otherwise, in the name of the corporation, all notes, checks, drafts, etc., received by the corporation, and shall have the general management of the affairs of the corporation, and perform all of the duties incidental to his office." The by-laws further provided that "these by-laws may be amended by the votes of a majority of the directors after the proposed amendment has been submitted in writing at a meeting of the board of directors held at least one week previously, but the operation of any one of them may be temporarily suspended by a vote of a majority of the board of directors." Soon after the reorganization of the paint

company, the party of the first part, in the agreement of February 5th, began shipping graphite ore, or a substance purporting to be graphite ore, to the paint company. A car load of this ore was received and ground; but it appears from the evidence that some fault was found with the quality, and there was some suggestion that future shipments must be of a higher grade. At the same time the party of the first part was urged to hasten shipments, and subsequently a boat load, consisting of some 14,000 bags, was shipped, and was duly received by the paint company. Prior to this last shipment, and on the 17th day of March, 1898, Dr. Savage paid over to the account of the paint company, in one of the local banks, the sum of $10,000, the amount agreed upon in the original contract between the parties, and there was a verbal agreement at the bank that the checks should be signed by Mr. Mershon as president, by Mr. Whitehill as treasurer, and that Dr. Savage should countersign the same with his initials, "F. B. S." It is further contended by the prosecution, and the learned trial court charged the jury that it was necessary to establish this fact, that subsequent to the deposit of this fund by Dr. Savage to the credit of the paint company there was an agreement among the several parties to the original agreement that no checks should be issued except those drawn in conformity with the arrangement at the bank; the object being that Dr. Savage should know the manner in which the money, already deposited to the credit of the company, and subject to disposition according to the provisions of the by-laws, was disbursed. This was the situation of affairs on the 3d day of May, 1898. The paint company had received and unloaded the cargo of graphite, and there had been some discussion of its merits, but no rejection of the cargo is shown, although there is evidence in the case from which it might be inferred that the material furnished was not graphite of a merchantable quality. More than the 10 days after shipment had elapsed, and the bill, according to the terms of the agreement, was due and payable. The defendant, acting as the president of the paint company, accompanied by Mr. Robinson, president of the American Ceylon Graphite Company, entered the office of the paint company on the 3d day of May, during the absence of the other officers of the company, and taking from the safe the check book, in which were two checks in blank signed by the treasurer and countersigned by "F. B. S.," filled up one of these for the amount of the bill of the graphite company, delivering the same to Mr. Robinson, who subsequently procured the payment of the same. After making several demands for the replacement of the money, under a threat that the defendant would be locked up if he did not comply with the demand, the matter was brought to the attention of the grand jury, and the defendant was indicted for forgery in the second degree in two counts, and for grand larceny in the first degree, the prosecution electing to go to the jury upon the forgery counts. From the judgment of conviction, and from an order denying a motion for a new trial, the defendant appeals to this court.

The objections of the defendant to the sufficiency of the indictment not being apparent upon the face of the instrument, it was proper to raise the questions upon the trial after the opening of the

prosecution to the jury and the admissions made therein by a mo-
tion to quash the indictment and to discharge the prisoner. The
charge, as it stood at the close of the prosecution's opening address
to the jury, was not that Stephen L. Mershon, acting as an indi-
vidual, had forged the check of the Hudson River Paint Company
with the signatures of two of its officers, and the initials of one of
its stockholders, but that Mr. Mershon, as the president of the com-
pany, in the absence of other officers, and in disregard of an alleged
informal verbal agreement between certain individuals, had filled in
and signed a check which already bore the signature of the treas-
urer and the initials of the stockholder, who assumed to have some
special rights in a sum of money which he had deposited to the
credit of the company in consideration of the issuance of certain
stocks to himself. It was admitted in the opening to the jury that
the defendant was the president of the company; that the company
had by-laws, which were introduced in evidence, and which gave the
president full power to "draw and sign checks, drafts, notes, and or-
ders for the payment of money"; and it was proper to ask the court
to determine whether the indictment charged the defendant with the
crime of forgery in the second degree. While we are disposed to
agree with the learned trial court that there were not at that time
enough facts upon the record to warrant the quashing of the indict-
ment, when the motion was renewed at the close of the people's
case we are of opinion that the facts developed were sufficient to
show that the indictment was insufficient to charge the defendant
with the crime of forgery in the second degree, and that it should
have been quashed. At the close of the people's case, the original
agreement of February 5th was in evidence, as was also the fact that
on the 17th day of March, 1898, Dr. Savage, in pursuance of that
agreement, had deposited to the credit of the paint company $10,000
in the National Bank of Newburgh. Upon the deposit of that money
to the credit of the paint company, Dr. Savage ceased to have any
control over it. He had received the consideration agreed upon,
and the money (or credit) passed to the Hudson River Paint Com-
pany, and became subject to the disposal of the officers of that com-
pany in the manner described in its by-laws. Dr. Savage was not a
director in the company. It is not pretended either that the by-
laws were ever amended, or that they were even temporarily sus-
pended, and, the money or its equivalent having passed to the con-
trol of the Hudson River Paint Company, how could Dr. Savage have
any right to enter into any agreement as to how the money of the
Hudson River Paint Company should be disbursed? It is not con-
tended that any such arrangement was made before the money was
deposited, and while it was yet in the control of Dr. Savage, or that
there was any such condition attaching to his purchase of the stock
of the company. The learned trial court instructed the jury that the
arrangement for signatures, said to have been made at the bank at
the time the money was deposited, was not sufficient to charge the
defendant with the crime, and there was no exception to this charge.
It seems equally clear to us that, the money having passed into the
possession or control of the Hudson River Paint Company, it ceased

to be subject to individual agreements of any kind or character whatever, and could only be disposed of in the manner directed by the officers of the company, in harmony with the by-laws. Clearly, if the defendant had made the arrangement at the bank that checks should be honored only when they were countersigned by an employé of the company, and if the defendant had agreed with such employé that he should sign such checks, no one would think of charging the president of the company with forgery because he had used a check signed in blank by such employé in the payment of a debt of the company, even though such employé should assert that the signature was intended for another purpose. We are unable to see that Dr. Savage stood in any different position than the employé would stand. He was not a member of the board of directors, to whom the law intrusts the transaction of the business of corporations, and, having no legal discretion as to the manner in which the business of the corporation should be transacted, he was not in a position to determine what use should be made of the checks which he had signed in blank, and which signature was necessary only for the purpose of giving currency to the check at the bank. To hold otherwise is for this court to assert the doctrine that Dr. Savage, an individual outside of the board of directors, might, by mere caprice, defeat the purposes of the corporation, and throw its affairs into chaos, by refusing to the officers the power to discharge its duties and obligations. This is so obviously opposed to public policy, and to the policy of the law under which corporations are formed, that this court cannot, even for the purpose of punishing a man who has evidently overreached a minister of the gospel in a business transaction, consent to give it its sanction. If the court would not allow the defendant to make an agreement by which the affairs of the corporation would become subject to the will of one who was not a member of the board of directors, he could not, while acting as president of such corporation, and within the letter and spirit of the by-laws, be guilty of forgery in the second degree, and the indictment should therefore have been quashed at the close of the people's case. Mr. Whitehill testified that the agreement in reference to the signature of Dr. Savage was to have a check on him,—a check upon the treasurer; but, as we have already pointed out, Dr. Savage, as a stockholder, had no right to any control over the acts of the officers of the company, and any agreement of this character could not be controlling when it came into conflict with the provisions of the by-laws which were concededly in force at the time of the transaction complained of by the people as constituting the crime. While the board of directors, acting informally, might make an agreement which would be controlling under some circumstances, it cannot be that a group of persons, not shown to constitute all of the stockholders, one at least of whom was not a director, could enter into a binding agreement in conflict with the by-laws of the company, and, unless there was an agreement of this character, the defendant, in making use of this check, could not have committed the crime with which he is charged in the indictment.

If, however, it be conceded that the indictment, under the admissions made by the people, was sufficient to charge the defendant with the crime of forgery in the second degree, it is difficult to read the evidence of the prosecution without coming to the conclusion that the jury must have been actuated by malice, prejudice, or other motives inconsistent with justice in reaching its verdict; for the conclusion is so entirely against the weight of evidence that we must look outside of the case as presented by the testimony to find any warrant for the verdict. The defendant was entitled to the presumption that he was innocent until he was proven guilty; to the presumption that he was acting within his authority as president of the corporation (Whart. Cr. Law [4th Ed.] § 713); to the presumption that the check was given for a good and valid debt against the corporation in whose behalf defendant acted (Bogert v. Morse, 1 N. Y. 377); and, when to these presumptions is added the documentary evidence contained in the by-laws giving authority to do exactly what was done, it is difficult to understand how the jury, in fairly considering the conflicting evidence, could come to the conclusion that the defendant was guilty of the crime charged. The evidence of the alleged agreement about the signatures is vague and uncertain. The treasurer testifies that it was made, not as a restriction upon the power of the president, but as a check upon himself; and Dr. Savage, who assumes to have had some special rights in the matter, is unable to state clearly what the agreement was, and there is no evidence from which it may be fairly inferred that the agreement went beyond an understanding as to the form which should be used in making out and signing checks.

In the matter of the quality of the material furnished, the evidence showed that only a comparatively few of the 14,000 bags which made up the cargo were examined; and while the evidence was conflicting, and the jury might have been warranted in finding that it was not up to the commercial standard, in so far as that which was examined was concerned, the evidence was not such as to the whole cargo, or even a major portion of it, as to warrant the jury in finding that there was any fraud. The price charged was far below the prevailing price for Ceylon graphite, and, to show fraud in the material sufficient to justify a conviction for crime, the evidence should have dealt with the entire cargo, and not with a few samples taken from a small number of bags by witnesses who were apparently bent on convicting the defendant. It is not necessary, however, in the conclusion we have reached, to discuss the evidence further.

The judgment of conviction should be reversed, and the defendant should be discharged. All concur.